UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


UNITED STATES OF AMERICA,                                    CR 09-414-RE

Plaintiff,

OPINION AND ORDER

v.

TRACY DEMARCUS FUENTES,

Defendant.

---

REDDEN, Judge:

      On April 21, 2008, Warm Springs Police Department detectives conducted a series of

warrantless searches of defendant Tracey Demarcus Fuentes' home and seized three firearms,

several rounds of ammunition, drug paraphernalia, and a small amount of marijuana. Because

Fuentes has three prior felony convictions, the United States charged him with being a felon in

PAGE 1 - OPINION AND ORDER

possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

Now before the court is Fuentes' Motion to Suppress (doc. 21) all evidence seized by the detectives during the course of their warrantless searches, and all statements made following his arrest. On February 23, 2011, I held an evidentiary hearing. For the reasons that follow, I find that the Warm Springs detectives' warrantless searches of Fuentes' residence do not fall within any valid exception to the warrant requirement, and that his subsequent consent to search was tainted by the impermissible searches. Accordingly, I GRANT the motion to suppress.

**Background**

Fuentes has three felony convictions in state court. In 1999, he was convicted for Assault in the Third Degree (with a firearm), and Unlawful Use of a Weapon (firearm). In 2001, he was convicted for Fleeing or Attempting to Elude a Police Officer. Consequently, he is prohibited from possessing a firearm. Between approximately 2004 and 2007, Fuentes was arrested on several different occasions for misdemeanor drug-related crimes and supervision violations.

On March 8, 2008, Fuentes reported a domestic disturbance at his residence. When Warm Springs police officers arrived, Fuentes appeared high on methamphetamine. Fuentes' father was also at the residence, and told police that Fuentes had been high on methamphetamine for three days. The officers searched the residence and found a Nagant bolt-action rifle, ammunition, methamphetamine, a glass pipe with methamphetamine residue, and a metal pipe with marijuana residue. The officers believed the Nagant rifle was the same one that a third party had previously reported stolen. The officers arrested Fuentes, and later released him.

Approximately six weeks later, on April 21, 2008, Warm Springs police officers interviewed the owner of the allegedly stolen Nagant rifle. He confirmed that the rifle had been

stolen from his residence one week before the officers found it in Fuentes' residence.

That same day, on April 21, 2008, Warm Springs Police Department detectives Sam Williams, John Webb, and Casey Lockey drove to Fuentes' residence to interview him about the Nagant rifle. The detectives did not suspect Fuentes of stealing the gun. Instead, they believed the father of Fuentes' girlfriend had stolen it. At the evidentiary hearing, the detectives testified that the purpose of the visit was to "simply interview" Fuentes about the stolen rifle. Tr. 176.[1] They did not have an arrest or search warrant.

Fuentes lives in a modest trailer home in a rural area on the Warm Springs Reservation. There is a long gravel driveway from the main road to a parking area in front of his home. There is one door at the front of the residence. To enter through that door, one must walk up five steps and across a small porch ten feet wide. Approximately twenty feet to the left of the front door is a large front window into the living room. The window is 53 inches off of the ground. There is no way to see into the living room window while standing on the porch. There is also a strip of grass, approximately ten feet wide, that separates the gravel parking area from the front window.

When the detectives arrived at Fuentes' home, there were no other vehicles parked at the residence. The detectives parked their undercover police vehicle "straight in front of the porch." Tr. 143. Detective Williams walked up the front steps and stood on the porch slightly to the left of the front door. Detective Webb stood on the gravel parking area to the left of the front porch, and Detective Lockey stood to the right of the porch. The detectives did not announce their presence as police officers, and none of them were in uniform.

Detective Williams knocked on the front door, waited a few moments, and then knocked

---

[1]"Tr." refers to the February 23, 2011 Official Transcript of Proceedings (doc. 36).

PAGE 3 - OPINION AND ORDER

again. There was no response. After the second knock, however, Detective Webb heard

"someone moving inside," just to the left of the front door. Tr. 30, 179, 214. Detective Webb

then walked several feet from his initial position, across the grass strip separating the residence

from the gravel parking area, and up to the large front window to look inside.

Standing on the grass strip separating the home from the driveway and "within a foot" of

Fuentes' living room window, Detective Webb "peeked" into the residence "with the purpose of

seeing if it was [Fuentes] moving around, to ask him to come to the door." Tr. 30-31, 69-70, 212,

216. With his face less than "six inches" from the window, Detective Webb noticed a multi-

colored glass pipe full of marijuana on an end table directly under the front window. Tr. 70-71.

He called Detective Lockey over to the window. Detective Lockey also observed the

multicolored glass pipe while standing "probably six inches" away from the window. Tr. 151.

The detectives could see the glass pipe from as far as two or three feet from window. Given the

size and location of the end table under the front window, however, the pipe was not visible from

the front steps, or the gravel parking area ten feet away from the window. Tr. 214-15.

Detectives Webb and Williams returned to the car to call the tribal prosecutor about

obtaining a search warrant, while Detective Lockey stayed at the window to keep an eye on the

pipe. Fuentes, who had been sitting on his couch, got up and looked out of his living room

window when he heard the detectives talking about a search warrant. When Fuentes looked out,

he saw Detective Lockey peering in. Detective Lockey was startled to see Fuentes "pop up" and

immediately drew his duty weapon, pointed it at Fuentes, and ordered him to put his hands in the

air and come to the front door. Tr. 124. Fuentes was startled to see Detective Lockey standing at

his living room window, pointing a gun at him. He grabbed the marijuana pipe and ran toward

PAGE 4 - OPINION AND ORDER

the back of the house.

The detectives surrounded the residence. When Fuentes exited the back door, Detectives Lockey and Williams ordered him to the ground with their guns drawn. After three verbal orders to get on the ground, Fuentes complied and Detective Lockey handcuffed him. The detectives immediately searched Fuentes, but did not find the marijuana pipe.

The detectives then asked Fuentes if there was anyone else in the residence, but he initally refused to answer. Detective Webb knocked on the back door and yelled, "Police." The detectives heard a muffled voice inside the house say, "it's not my house." Tr. 185. Detective Webb told the occupant to open the door, or he would kick it in. Fuentes then yelled to the person in the house to open the door, and a man named Milton Sahme Jr. came out. The detectives detained and searched Sahme, but did not find the pipe.

After escorting Fuentes and Sahme around the house to the detective's police vehicle, the detectives conducted a "protective sweep" of the residence. Tr. 99. The sweep took about a minute and the detectives looked only in places where a person could be hiding. No one else was inside, but the detectives saw a .22 caliber rifle in plain view in the master bedroom.

The detectives testified that the reasons for the protective search included Fuentes' earlier "felony convictions for weapons," his "unpredictability" under the influence of drugs during previous interactions with police, his failure to answer the door, grabbing the marijuana pipe and fleeing, the presence of an unidentified male in the residence, and the uncertain location of the marijuana pipe. Tr. 186. They also noted that Fuentes initially failed to comply with Detective Lockey's order to get on the ground and refused to respond when the detectives asked whether anyone else was inside. Detective Webb acknowledged, however, that after arresting Fuentes

and Sahme, there were no specific facts suggesting anyone else was in the home. Tr. 247-48.

After the protective sweep, the detectives read Fuentes his tribal and <u>Miranda</u> rights from prepared Advice of Rights forms. Fuentes did not sign either form, but stated he understood his rights and was willing to answer questions. The subsequent conversation was calm. Fuentes was in handcuffs, but the detectives did not threaten him. Fuentes appeared to understand the questions, and responded intelligently.

The detectives asked Fuentes about the allegedly stolen Nagant rifle that Warm Springs police officers had seized from his residence on March 8, 2008. They also asked Fuentes where he put the marijuana pipe they saw through the living room window. Fuentes said he handed the pipe to Sahme, but the detectives never found it.

During the course of the conversation, the detectives asked Fuentes for permission to search the residence three separate times. Tr. 239. Fuentes initially stated the residence did not belong to him, so he could not consent. After establishing that Fuentes had lived in the home for six months and paid the utility bill, they again asked for permission to search. Detective Webb explained that the search was voluntary, and that Fuentes could stop the search at any time. After twice refusing to consent, Fuentes finally said, "let's do this." Tr. 45-46, 132-34, 194. Detective Webb asked Fuentes to read and sign a Consent to Search form, but Fuentes again refused to sign anything. Instead, he simply said, "let's just do this." Tr. 195. At the hearing, Fuentes testified that since the detectives "already went in. . . . I thought it was already a done deal." Tr. 267.

As the detectives searched the residence, Fuentes sat handcuffed in the living room and volunteered information about the location of a methamphetamine pipe and a .32 caliber semi-automatic pistol. During the search, the detectives also found a sawed-off shotgun, a .22 caliber

rifle, ammunition, drug paraphernalia and scales with methamphetamine residue, and a small amount of marijuana. Fuentes admitted ownership of the guns and that he was dealing drugs.

A federal grand jury subsequently returned an indictment charging Fuentes with being a felon in possession of the three firearms the Warm Springs detectives seized from his residence on April 21, 2008. Fuentes moves to suppress all evidence and statements obtained as a result of the Warm Springs detectives' warrantless searches of his residence on that date. He argues that the detectives violated his right to be free from unreasonable search and seizure by (1) entering the curtilage of his home and conducting a warrantless search of his living room, and (2) conducting a protective sweep of his residence without a reasonable suspicion of any danger to the officers or potential destruction of evidence. Fuentes also contends that his consent to search the residence was involuntary and/or tainted by those unlawful searches.

## Legal Standards

Tribal police actions are governed by the Indian Civil Rights Act ("ICRA"), which provides that "[n]o Indian tribe in exercising powers of self-government shall . . . violate the right of the people to be secure in their persons, houses, papers, and effects against unreasonable search and seizures." 25 U.S.C. § 1302(2). Because the ICRA "imposes an identical limitation on tribal government conduct as the Fourth Amendment," courts analyze the reasonableness of tribal police activities under Fourth Amendment jurisprudence. United States v. Becerra-Gracia, 397 F.3d 1167, 1171 (9th Cir. 2005) (quotation marks and citation omitted).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "Nowhere is the protective force of the fourth amendment more powerful than it is when the

PAGE 7 - OPINION AND ORDER

sanctity of the home is involved." <u>Los Angeles Police Protective League v. Gates</u>, 907 F.2d 879,

884 (9th Cir. 1990). Accordingly, it is a "basic principle" of Fourth Amendment law that

"searches and seizures inside a home without a warrant are presumptively unreasonable."

<u>Brigham City v. Stuart</u>, 547 U.S. 398, 403 (2006). This presumption may be overcome,

however, if the government can show that the search falls within "one of a carefully defined set

of exceptions." <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 474 (1971). The warrant

requirement is subject to "certain reasonable exceptions" because the "touchstone of the Fourth

Amendment is reasonableness." <u>Kentucky v. King</u>, 563 U.S.___, 131 S. Ct. 1849, 1856 (2011)

(quotation marks and citation omitted).

## Discussion

*1. Observations of the Marijuana Pipe*

The government invites the court to assume (and I find) that Detective Webb breached

the curtilage of Fuentes' rural home when he walked away from the front door, crossed the

grassy area separating the driveway from the home, and stood within inches of Fuentes' living

room window to look inside. The government contends, however, that Detective Webb's

warrantless search of Fuentes' living room was lawful because he entered the curtilage of the

residence and peered into the living room simply to contact Fuentes.[2] I disagree.

The protections afforded by the Fourth Amendment extend to unreasonable searches of

---

[2]The government also suggests that Detective Webb looked into Fuentes' living room
window for officer safety reasons. Gov't Resp. at 3; Gov't Post-Hearing Resp. at 12. At the
evidentiary hearing, however, none of the detectives mentioned officer safety as a reason for
looking into the living room window. In any event, the government does not point to any
specific facts that would support an objectively reasonable concern for officer safety at the time
Detective Webb looked into the window. Fuentes' criminal history and his refusal to answer the
door, standing alone, do not justify a warrantless search based on officer safety concerns.

PAGE 8 - OPINION AND ORDER

the curtilage of a home, which is the area immediately surrounding the dwelling and harbors "the

intimate activity associated with the sanctity of a man's home and the privacies of life." United

States v. Dunn, 480 U.S. 294, 300 (1987) (quotation omitted). The Ninth Circuit has long held,

however, that a law enforcement officer may "walk up to the steps and knock at the front door of

any" person's home "with the honest intent of asking questions of the occupant . . . ." Davis v.

United States, 327 F.2d 301, 303 (9th Cir. 1964). The Ninth Circuit has also recognized that

officers must sometimes move away from the front door when they are attempting to contact the

occupants of a residence. United States v. Garcia, 997 F.2d 1273, 1279 (9th Cir. 1993). Where a

front door is inaccessible, for example, "there is nothing unlawful or unreasonable about going to

the back of the house to look for another door." United States v. Hammett, 236 F.3d 1054, 1059

(9th Cir. 2001) (citing United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990)). Generally,

the subsequent discovery of evidence in plain view does not violate the Fourth Amendment.

Garcia, 997 F.2d at 1279.

While officers may move away from the front door when attempting to contact the

occupants of a residence, none of the cases cited by the government permit law enforcement

officers to enter the curtilage of a home, stand within inches of a window that is not associated

with any point of entry, and peer into the home to see what is going on inside. In United States v.

Hammett, 236 F.3d 1054 (9th Cir. 2001), officers walked through a wooded, secluded area to

interview the occupants of a residence, who were suspected of cultivating marijuana:

> Once the officers reached the home, they knocked on the door and shouted
> "Police." When they received no answer, the officers looked through the window
> next to the door, but saw no inhabitants. [The officer] again yelled through the
> window, and again received no answer.

PAGE 9 - OPINION AND ORDER

The officers then proceeded to circle the house, calling out "Police" and knocking on the walls as they went. The officers testified that they circled the home for the purposes of: (1) locating a back entrance; (2) contacting people behind the structure willing to speak with them; and (3) ensuring their safety. When the officers were approximately ten to fifteen feet away from having completely circled the home, [an officer] observed a small crack in the overlapping pieces of corrugated steel siding forming the walls of Hammett's residence. The crack was one-half to one inch wide. Through the crack, the officers observed at least three marijuana plants inside the residence.

Hammett, 236 F.3d at 1059. Importantly, "the officers were able to view the marijuana plants from a distance of five to six feet without making any contortions." Id. at 1061.

The Ninth Circuit upheld the validity of that search, concluding that "an officer may, in good faith, move away from the front door when seeking to contact the occupants of a residence." Id. at 1060. In so holding, the Ninth Circuit relied on Garcia, in which the Ninth Circuit found no Fourth Amendment violation where officers approached the back door of an apartment, "reasonably believing it [was] used as a principal entrance," and observed the defendant through the screen door carrying a kilo-sized package. Garcia, 997 F.2d at 128. The Hammett Court also noted that in United States v. Daoust, 916 F.2d 757 (1st Cir. 1990), the First Circuit found no violation where officers inadvertently saw a gun through the defendant's kitchen window as they were walking to the back of the residence, "looking for an accessible main floor entrance" because the front door was inaccessible. Id. at 758.[3] In each of those cases, the officers inadvertently observed evidence in plain view while attempting to locate someone

---

[3]The government also cites Keyes v. Stauffer, 170 Fed. App'x 465, 2006 WL 544404 (9th Cir. Mar. 7, 2006), in which the Ninth Circuit relied on Hammett to find no constitutional violation where officers "entered Keyes' property, knocked on his door, circled his house while calling out his name, and looked in his windows in an attempt to locate him." Id. at 466. Keyes is an unpublished opinion and therefore, has no precedential value. Ninth Circuit Rule 36-3; Thomas v. Newton Intern. Enterprises, 42 F.3d 1266, 1272 (9th Cir. 1994).

PAGE 10 - OPINION AND ORDER

outside of the residence with whom they could speak, or an alternate point of entry at which they might contact the occupant.

In contrast to the inadvertent observation of evidence while attempting to locate a back door in Hammett and Garcia, Detective Webb moved away from Fuentes' front entrance, stood within inches of a window that was not associated with any point of entry, and looked into the home "with the purpose of seeing if it was [Fuentes] moving around" inside. Tr. 216. This is fundamentally different than the police activity sanctioned in Hammett and Garcia. Those cases do not permit an officer to enter the curtilage of a home when the occupant refuses to answer the door, put his or her face up to a window disconnected from any point of entry, and search the interior simply by asserting that they were attempting to contact the occupant.

The government's focus on Detective Webb's ostensible good faith intention to simply contact Fuentes conflicts with well-established Fourth Amendment jurisprudence. Indeed, the Supreme Court has repeatedly rejected Fourth Amendment tests that turn on an officer's subjective intent. This is because "evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective mind of the officer." King, 131 S.Ct. at 1859 (citation omitted). Whether peering into a window of a home constitutes a search is not dependent on the subjective intent of the officer, but whether the officer was in a position where he was entitled to be when his observations were made. See Illinois v. Andreas, 463 U.S. 765, 771 (1983). Regardless of Detective Webb's subjective intent, the topography of Fuentes' yard and the location of his living room window simply did not invite visitors, impliedly or expressly, to stand within inches of the living room window to contact the occupants. Detective Webb was not standing in a place where he was

PAGE 11 - OPINION AND ORDER

entitled to be when he put his face up to Fuentes' living room window and looked inside.

Under the government's interpretation of Hammett, whenever an officer knocks on the door of a home and the occupant declines to respond, the officer is free to roam the property and peer into any window of the home simply by asserting that they were attempting to contact the occupants. Such a rule would eviscerate the occupant's right to decline to answer the door. See King, 131 S. Ct. at 1862 ("the occupant has no obligation to open the door or to speak"). Further, if an officer is permitted to breach the curtilage of a home, press his face to the glass of any window, and peer into the home whenever he asserts he is attempting to contact the occupant, what would prevent him from opening the front door or a window? After all, the officer would have a better chance of contacting the occupant that way. I decline to extend Hammett and Garcia to circumstances in which law enforcement officers enter the curtilage of a home, stand within inches of a window not associated with any point of entry, and peer inside without a warrant or any other justification.

Finally, the government suggests that Kentucky v. King, 131 S. Ct. 1849 (2010), supports the detectives' warrantless search of Fuentes' living room. I disagree. Unlike the exigent circumstances in King, where officers detected the strong smell of marijuana, knocked on the door, and then heard the sound of evidence being destroyed, there were no exigent circumstances preceding Detective Webb's search of Fuentes' living room. At the time Detective Webb looked into Fuentes' living room, he had no specific, particularized basis for believing that a crime had been committed, that his safety was threatened, or that evidence was being destroyed. That the detectives heard movement after Fuentes refused to answer the door does not give rise to a reasonable belief that a warrantless search was necessary to ensure officer safety or prevent the

PAGE 12 - OPINION AND ORDER

imminent destruction of evidence. <u>King</u> does not support the conclusion that Detective Webb's warrantless search of Fuentes' living room was justified.

Under the specific circumstances of this case, I find it was unreasonable for Detective Webb to enter the curtilage of Fuentes' home, stand within inches of a window that is not associated with any point of entry, and peer into the home without any particularized basis for believing exigent circumstances existed. Accordingly, the detectives' observations of the marijuana pipe were unlawful.

*2. Protective Sweep*

Because the detectives were not in a lawful position when they observed the marijuana pipe and demanded Fuentes come outside, the exigent circumstances exception does not justify the detectives' subsequent entry and search of the residence. <u>King</u>, 131 S. Ct. at 1862. Even if the detectives initial observations of the marijuana pipe were lawful, the detectives' protective sweep was impermissible because there were no specific, articulable facts indicating that other persons were in the residence who might pose a threat to the officers or destroy evidence. <u>United States v. Delgadillo-Velasquez</u>, 856 F.2d 1292, 1299 (9th Cir. 1988).

Warrantless searches violate a defendant's Fourth Amendment rights unless the government can demonstrate that an established, well-defined exception applies. <u>United States v. Murphy</u>, 516 F.3d 1117, 1120 (9th Cir. 2008). One well-recognized exception applies when "the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." <u>Mincey v. Arizona</u>, 437 U.S. 385, 394 (1978). Exigent circumstances exist if law enforcement officers have probable cause to believe a crime has been committed or is being committed and a reasonable belief that entry is

PAGE 13 - OPINION AND ORDER

"necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." United States v. Alaimalo, 313 F.3d 1188, 1192-93 (9th Cir. 2002). The government bears the burden of demonstrating specific, articulable facts that support a reasonable belief that other persons are in the residence who may pose a threat to the officers or who might destroy evidence. Delgadillo-Velasquez, 856 F.2d at 1298. Law enforcement officers may not, however, rely on the exigent circumstances rule when law enforcement officers "create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment." King, 131 S. Ct. at 1858.

Here, I find that the detectives created any purportedly exigent circumstances by unlawfully peering into Fuentes living room, drawing their weapons, and demanding that Fuentes answer the door. As discussed, I find the detectives violated Fuentes' Fourth Amendment rights by breaching the curtilage of his home, standing within inches of his living room window, and peering inside to determine the source of the movement in the home. The detectives' observations of the marijuana pipe and Fuentes in his living room were unlawful. Accordingly, Detective Webb had no basis for drawing his duty weapon, pointing it at Fuentes, and demanding that he come outside. Because any purported exigent circumstances were caused by the detectives' actual violations of Fuentes' Fourth Amendment rights, the exigent circumstances exception to the warrant requirement does not justify the detectives' subsequent entry and protective sweep. King, 131 S.Ct. at 1862.

Even if the detectives did not violate Fuentes' Fourth Amendment rights in peering into his living room window, their subsequent protective sweep was impermissible because there

were no specific facts to support a reasonable belief that "other persons (who might possibly pose

a threat to the officers or who might destroy evidence) were inside." Delgadillo-Velasquez, 856

F.2d at 1299 (emphasis added); see also Maryland v. Buie, 494 U.S. 325, 337 (1990) (The Fourth

Amendment "permits a properly limited protective sweep . . . when the searching officer

possesses a reasonable belief based on specific and articulable facts that the area to be swept

harbors an individual posing a danger to those on the arrest scene."). By the time the detectives

initiated the protective sweep in this case, the detectives had already arrested Fuentes and Milton

Sahme at the back of the residence and escorted them around to the front of the house. They had

no specific, particularized information that would lead them to reasonably believe anyone else

was in the home. Tr. 248; see also Tr. 98.

        Fuentes' criminal history and his unpredictability during previous interactions with Warm

Springs police do not give rise to a reasonable belief that someone else was in the residence at

the time of his arrest. See United States v. Colbert, 76 F.3d 773, 777 (6th Cir. 1996) ("If district

courts are allowed to justify protective sweeps based on the dangerousness of the arrestee, nearly

every arrest taking place at or near a home will include a protective sweep."). Fuentes had no

obligation to answer the door or speak to the detectives, and they had no reason to believe

exigent circumstances existed when they knocked. Thus, his initial refusal to answer the door is

irrelevant. That Fuentes subsequently ignored Detective Lockey's commands and grabbed the

marijuana pipe and ran outside the house does not suggest someone else was in the residence

who might pose a threat to the officers or destroy evidence. Moreover, once Fuentes was in

custody, there was no longer a reason to believe he might destroy any evidence. Fuentes' initial

refusal to get on the ground in the backyard and his refusal to answer the detectives' questions is

PAGE 15 - OPINION AND ORDER

not evidence that someone else was in the house.  The detectives' lack of information or the uncertainty of the situation "cannot provide an articulable basis upon which to justify a protective sweep."  Colbert, 76 F.3d at 778.  If it did, every arrest near a home would include a protective sweep of the home.  Finally, once Sahme was in custody, the officers had identified the previously unknown male voice in the home and there were no specific facts to support a reasonable belief that others may be on the premises who may destroy evidence or pose a threat. Accordingly, the detectives' protective sweep was unlawful.

    *3. Consent to Search*

    The government argues that because Fuentes voluntarily consented to a search of his home after his arrest, the detectives' seizure of evidence was lawful.  I disagree.  Even if Fuentes' consent could be characterized as voluntary, the evidence must be suppressed because any purported consent was "not sufficiently attenuated" from the unconstitutional conduct that preceded it.  United States v. Taheri, 648 F.2d 598, 601 (9th Cir. 1981).

    "It is well established that, under the 'fruits of the poisonous tree' doctrine, evidence obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is inadmissible, despite a person's voluntary consent, unless the evidence obtained was 'purged of the primary taint.'"  United States v. Washington, 490 F.3d 765, 774 (9th Cir. 2007) (quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963)); see also United States v. Hotal, 143 F.3d 1223, 1228 (9th Cir. 1998) ("Because we conclude that the initial entry was impermissible and that the evidence seized pursuant to the warrant must be suppressed, all of the other evidence seized must also be suppressed. Consent to search that is given after an illegal entry is tainted and invalid under the Fourth Amendment") (emphasis in original); United States v. Suarez, 902 F.2d

PAGE 16 - OPINION AND ORDER

1466, 1468 (9th Cir. 1990); United States v. Howard, 828 F.2d 552, 553 (9th Cir. 1987).

Where consent to search is preceded by a Fourth Amendment violation, the government bears the burden of demonstrating that the consent is not only voluntary, but also "sufficiently an act of free will to purge the primary taint." Washington, 490 F.3d at 774. To determine whether the challenged evidence is sufficiently attenuated from the primary taint, courts consider: (1) the temporal proximity between the consent and the unlawful conduct; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct. Washington, 490 F.3d at 776 (applying Brown v. Illinois 422 U.S. 590, 603-04 (1975) to determine whether consent to search was tainted by Fourth Amendment violation). Whether Miranda warnings were administered prior to consent is also a relevant factor. Brown, 422 U.S. at 603-04. Suppression is justified only when the discovery of evidence results from illegal government action. United States v. Pulliam, 405 F.3d 782, 786 (9th Cir. 2005). A causal connection exists between the illegal action and the tainted evidence when the "illegal activity tends to significantly direct the investigation to the evidence in question." United States v. Johns, 891 F.2d 243, 245 (9th Cir. 1989) (citation omitted).

Applying the Brown factors to this case, I find that the detectives' unlawful searches of Fuentes' residence unconstitutionally tainted his purported consent to search. The detectives' discovery of the seized firearms in Fuentes home occurred as a direct result of their unlawful searches. Absent their unlawful observations of the marijuana pipe in Fuentes' living room and the gun during the protective sweep, the detectives had no basis for arresting Fuentes or seeking permission to further search the residence.

Although the detectives administered Miranda warnings prior to Fuentes' consent, there

PAGE 17 - OPINION AND ORDER

were no intervening events or lapse of time to show his consent was "sufficiently an act of free will to purge the primary taint of the unlawful invasion." <u>Washington</u>, 490 F.3d at 774. The detectives sought and obtained Fuentes' consent to search immediately after the arrest. Fuentes was handcuffed, initially refused consent, refused to sign a consent form, and finally said "let's do it" in response to repeated requests for permission to search. Given the timing of the consent inquiry and Fuentes' perception that the officers had already searched his home, Fuentes' statement, "let's just do this" was not a sufficient act of free will to "purge the primary taint of the unlawful invasion." <u>Taheri</u>, 648 F.2d at 601.

The third factor also weighs against the government. Although the detectives' initial purpose in going to Fuentes' home was simply to interview him about the stolen rifle, their conduct after Fuentes refused to answer the door suggests a fishing expedition "in the hope that something [illegal] might turn up." <u>Brown</u>, 422 U.S. at 605. As discussed, Fuentes had no obligation to answer the door to speak with the detectives. After knocking on Fuentes' door and receiving no response, the detectives could have attempting to arrange another time to interview Fuentes about the allegedly stolen rifle they seized six weeks earlier, or they could have attempted to obtain a warrant. Instead, they chose to ignore Fuentes' right to decline to be interviewed and without any reasonable suspicion or probable cause, engaged in an investigatory or expeditionary search of his living room. This weighs in favor of suppression.

## Conclusion

Under the specific circumstances of this case, I find that the Warm Springs detectives' warrantless searches of Fuentes' residence do not fall within any valid exception to the warrant requirement, and that Fuentes' consent to search was tainted by those unlawful searches.

PAGE 18 - OPINION AND ORDER

Accordingly, I GRANT Fuentes' Motion to Suppress (doc. 21) all evidence seized by the detectives during the course of their warrantless searches, and all statements made following his arrest.

IT IS SO ORDERED.

DATED this ___ day of July, 2011.

James A. Redden
United States District Judge

PAGE 19 - OPINION AND ORDER